**BIRMINGHAM REALTY COMPANY, a corporation, Plaintiff,**

v.

**GENERAL SERVICES ADMINISTRATION, Defendant,**

**Walter G. Brush, Intervenor.**

**Civ. A. No. 80–C–1013–S.**

United States District Court, N. D. Alabama, S. D.

Sept. 30, 1980.

E. Mabry Rogers, William Bew White, Bradley, Arant, Rose & White, Birmingham, Ala., for plaintiff.

L. Drew Redden and William Clark, Redden, Mills & Clark, Birmingham, Ala., for intervenor.

J. R. Brooks, U. S. Atty., and Henry Froshin, Asst. U. S. Atty., Birmingham, Ala., for defendant.

## MEMORANDUM OF OPINION

CLEMON, District Judge.

### Introduction

In this action, the plaintiff Birmingham Realty Company seeks to have this Court set aside the defendant General Services Administration's award of a contract to the intervenor Walter G. Brush. Under the terms of that contract, the intervenor has obligated himself to provide office space for the Bankruptcy Court and the Secret Service in Birmingham, Alabama, over the next five years. The plaintiff's challenge to the award is premised on the National Environmental Policy Act of 1969, the Public Buildings Cooperative Use Act, Executive Order 12072, the National Historic Preservation Act of 1966, and various procurement regulations embodied in the Code of Federal Regulations ("CFR").

This action was filed on August 8, 1980 and the plaintiff's request for a temporary restraining order was heard and denied by the Court on August 11, 1980. The motion for a preliminary hearing was set for August 26, 1980, and pursuant to FRCP 65(a)(2), the trial on the merits of the case was ordered advanced and consolidated with the preliminary hearing. The case was tried on August 26–28, 1980; and taken under submission upon the conclusion of trial.

## FACTS

### Background Of The Solicitation

Under Federal law, the defendant General Services Administration ("GSA") is charged with the responsibility for procuring office space for the various federal agencies. 40 U.S.C. § 471, et seq.

On July 13, 1979 the Bankruptcy Court of the Northern District of Alabama requested the defendant to procure approximately 13,000 square feet of space for it. At that time the Bankruptcy Court was located in three separate buildings—which significantly impaired the efficiency of the court's operations. Because of the streamlined procedures contemplated by the 1978 Bankruptcy Reform Act, 11 U.S.C. 101, et seq., the Bankruptcy Court in the Northern District of Alabama was required by the Administrative Office of the Courts and the Judicial Conference of the Fifth Circuit Court of Appeals to locate its three separate office sites in a single location. The leasehold for one of the three offices (the Debtor's Court) expires on September 30, 1980. For these reasons, the Bankruptcy Court initiated the request of defendant for additional space.

Since 1972, the Birmingham Field Office of the United States Secret Service has been housed in a commercial building in Homewood, Alabama, a suburb of Birmingham. The Homewood building is owned by Central Bank of Birmingham.

The Secret Service's lease of the Homewood premises expired on June 30, 1980. Central Bank timely notified the Secret Service of its intention not to renew the lease; and, thus, at some point in 1979 the Secret Service requested the defendant to procure approximately 4,000 square feet of space for its continued operations in the Birmingham region.

In January 1980 the defendant caused to be published in *The Birmingham News*, a daily newspaper of general circulation in metropolitan Birmingham, a notice of its desire to lease 12,000 square feet of space in the Birmingham downtown business district. Owners and agents desiring to submit a location for consideration were invited to contact the defendant by February 4, 1980. Plaintiff Birmingham Realty Company did not communicate its desire that the Stallings Building be considered as a possible lessor for the Bankruptcy Court to the defendant by the said date.

On February 5–8, 1980, the defendant's Realty Specialist conducted a comprehensive market survey of the Birmingham central business district with respect to the anticipated needs of the Bankruptcy Court and the Secret Service. Nine buildings, including the intervenor Walter Brush's 500 Building, were inspected by the Realty Specialist, accompanied by representatives of the Bankruptcy Court and of the Secret Service. The Frank Nelson Building, also owned by the plaintiff, was among the buildings so inspected. The Stallings Building was not inspected because at the time the market survey was conducted its owners had not planned to offer it as space for the Bankruptcy Court. Rather, the plaintiff was aggressively pushing the Frank Nelson Building as the prime candidate for the Bankruptcy Court.[1]

Following its market survey, the defendant issued its Solicitation for Offers. Shortly after it received the solicitation package from the defendant, plaintiff realized that the Frank Nelson Building could not possibly meet the requirements of the solicitation.

### The Solicitation

On March 12, 1980, the defendant issued a "Solicitation For Offers" for the space required by the Secret Service and the

---

1. Plaintiff's initial decision to offer the Frank Nelson Building for the Bankruptcy Court is wholly understandable, for that Building has housed the Debtor's Court division of the Bankruptcy Court for the past forty years and in addition to the Debtor's Court, today it houses the Trustee in Bankruptcy. Plaintiff's clearly-expressed intent was to have transferred all of the operations of the Bankruptcy Court to its Frank Nelson Building, as it realized that many of its lawyer–tenants would relocate should the Debtor's Court be transferred to another building.

Bankruptcy Court. The solicitation, issued under § 302(c)(10) of the Federal Property and Administrative Services Act of 1949, requested offers for the leasing of 16,950 net usable square feet of space in a delineated area of the Central Business Area of Birmingham. Offers were to be received until 4:30 P.M., March 26, 1980, local time at Atlanta, Georgia, where the GSA Space Management Division of the Public Buildings Service ("PBS") has its regional office. Ms. Winifred R. Brown, a Realty Specialist of the defendant, was shown as the official who would be handling requests for information concerning the offer. The solicitation further provided that the desired occupancy dates for the property was June 1, 1980, for "Block B."

Under "Schedule A", attached to the solicitation, "Block A" was defined as 12,276 net usable square feet of office and Court related space; "Block B" was defined as 4,674 net usable square feet of office and related space. This schedule further provided, in relevant part,

"Each block offered must be contiguous, modern and air conditioned, and must be in a modern first–class office building.... Space offered must be contiguous, modern and air–conditioned, and must be in a modern first–class office building."

With respect to the parking requirements, the solicitation provided as follows:

"Assigned parking for nineteen (19) vehicles is required, as follows:

Block A–Four assigned spaces contiguous to building.

Block B–Fifteen (15) parking spaces are required, four (4) of which must be inside secured; four (4) may be outside secured by chain link fence; the balance of seven (7) may be contiguous to building or within two blocks of the building in which space is offered ..."

In addition certain "Special Requirements" were set forth for Block A and Block B, respectively.

Under Schedule B of the Solicitation, it is provided, inter alia, that "[a]ll applicable Federal laws and Executive Orders, such as the National Environmental Policy Act of 1969 and EO 11593, Protective and Enhancement of Cultural Environment, will be complied with in making an award."

### Offers Received In Response To The Solicitation

The defendant received six offers in response to its solicitation. Each of these offers was analyzed by its Realty Specialist.

#### (a) The Brown Marx Building

The lowest offer was submitted on behalf of the Two Thousand and One Center ("the Brown Marx Building"), whose consolidated offers for Block A and Block B came to $6.49 per square foot ("psf"). The Realty Specialist negotiated with the agent for the Brown Marx Building, and succeeded, it appears, only in clarifying the terms of the offer.

The sixteen–story Brown Marx Building was designed by William C. Weston in the Commercial style popular during the period in which it was constructed. The building was constructed in two phases: the first phase was begun in 1906; and a 1908 addition nearly doubled the size of the building. The Advisory Council on Historic Preservation found that the Brown Marx Building is one of

"four historic skyscrapers built in the first decade of this century which are major landmarks of the City ... These four buildings were the pride of the young, steel–prosperous city, and the area was once known as "The Heaviest Corner on Earth". All four buildings are historically and architecturally important."

The Advisory Council specifically found the Brown Marx Building to be "historically and architecturally significant under the terms of the Public Buildings Cooperative Use Act." The building admittedly did not meet the solicitation requirements; but its agent assured the Realty Specialist that it could be modified to meet the specifications. The Realty Specialist caused an engineer to inspect the building; and he concluded that between four and six months would be needed for completion of the required modifications.

This building was rejected by the defendant because "[t]he space offered is on different levels, which would present problems for an efficient layout especially for Courts, and contiguous parking is not totally confirmed." Moreover, the Realty Specialist was influenced by the fact that the judges of the Bankruptcy Court and the Referee in Bankruptcy were totally opposed to accepting space in the building.

### (b) The 500 Building

Negotiations by defendant's Realty Specialist with the intervenor Walter Brush for space in the 500 Building culminated in the second lowest offer [2] submitted in response to the Solicitation—$6.94 psf. The 500 Building is located on the corner of 22nd Street and 5th Avenue South in the City of Birmingham. Parking requirements of both the Bankruptcy Court and the Secret Service can be met at this location, contiguous to the building. Four contiguous assigned parking spaces are provided for Block A; seven contiguous assigned parking spaces and on–site secured parking are provided for Block B. Moreover, free two–hour street parking for visitors (e. g., debtors and bankrupts) is easily accessible from the 500 Building.

All of the space for Block A can be accommodated on a single floor.

The 500 Building was originally constructed in 1938, as the manufacturing facility and headquarters of the Birmingham Paper Company. Sometime later, the facility came to be utilized as a warehouse; and it served as such when the intervenor acquired it some ten years ago.

Within the past two years, the 500 Building has been renovated extensively. The exterior of the building was re–bricked in its entirety; and the interior was also refurbished. A completely new electrical wiring system, new bathrooms and air–conditioning were installed. In short, the old warehouse was, by June 1979, completely converted into a modern, first–class office building. To encourage the rehabilitation

of this building, the City of Birmingham granted a tax rebate and the intervenor was allowed a federal tax credit.

### (c) The Stallings Building

The Stallings Building housed the Chamber of Commerce of the City of Birmingham for thirty–nine years. It was constructed in 1909 of steel–frame and reinforced concrete with an elaborate brick exterior trimmed with gray terra cotta and Moravian tile inserts. It was designed in the Chicago school style with the main entrance flanked by Tuscan columns supporting a lintel with the words, "Stallings Building." As a reminder of the once–bustling First Avenue at the turn of the century when the City of Birmingham mushroomed in two short decades from a railroad crossing to the largest city in Alabama (earning the nickname by which it has been known ever since: The Magic City), the Stallings Building is one of notable historical significance.

The Advisory Council on Historic Preservation has found and declared the Stallings Building to be "historically significant" under the terms of the Public Buildings Cooperative Use Act, 40 U.S.C. § 601, et seq. The Stallings Building is not listed on the National Register nor has it been nominated for inclusion on the Register.

The Stallings Building is located on the corner of First Avenue North and Nineteenth Street in the City of Birmingham. Under the City's current Downtown Revitalization Program, Nineteenth Street is projected to be a prime thoroughfare and shopping district in the city. A strong client or tenant in the Stallings Building, such as the Bankruptcy Court, would be of vital assistance to the Downtown Revitalization Plan, as such a tenant will attract others and will encourage the flow of capital in that area.

On the other hand, the present condition of the Stallings Building is described properly as "dilapidated". The evidence indi-

---

**2.** Intervenor's original offer was effectively $7.91 psf for the aggregate space required for Block A and Block B.

cates that as of March of this year there were only five tenants in the building.

There are roughly 7,500 square feet of usable space on the first and second floors of the Stallings Building; so that, should the Bankruptcy Court be housed in the building, the various operations of the court would be divided between two floors. Further, visitors to the Stallings Building would encounter difficulty in locating adequate parking.

The mission of the Secret Service's office in Birmingham would be impaired should that agency be housed in the Stallings Building. A secret service agent transporting an arrested suspect to his office for interrogation would be required to escort the handcuffed suspect on the sidewalk and into the Stallings Building, thereby incurring substantial security risks. Moreover, confidential informants would be less likely to visit the Secret Service agents if such agents were housed in the Stallings Building in the heart of a downtown commercial and shopping district, rather than in a more remote setting.

The plaintiff acquired the Stallings Building on December 31, 1979. As stated above, when the plaintiff purchased the Stallings Building, it did not intend to lease it to the defendant for use as a Bankruptcy Court.

On or about April 1, 1980, after learning that its Frank Nelson Building could not possibly meet the requirements of the Solicitation, plaintiff sent to defendant its offer to lease the Stallings Building, at the rate of $7.02 psf. In its offer, plaintiff invited the defendant's attention to the fact that the Stallings Building was of "great historical significance". Except with respect to the requirement of contiguous parking spaces for Block A, plaintiff's offer was otherwise responsive to the defendant's March 12, 1980, Solicitation as amended April 4, 1980.[3]

On May 12, 1980, defendant's Realty Specialist contacted Russell Cunningham, business manager of the plaintiff company. During their discussion and negotiations, the Realty Specialist informed Cunningham that plaintiff's offer was unresponsive with respect to the requirement of contiguous parking spaces for Block A. At the end of their conversation, the Realty Specialist inquired of Cunningham whether the plaintiff's offer of $7.02 psf was its "best and final offer," to which Cunningham responded in the affirmative.

Although the plaintiff was given fair and reasonable notice that its offer was unresponsive to the solicitation, plaintiff took no steps to make its offer a responsive one until the offer of intervenor Walter Brush was accepted by the defendant on June 9, 1980. Three days thereafter, the plaintiff notified the defendant that it would indeed provide the required contiguous parking spaces.

The defendant never considered the historical significance of the Stallings Building.[4] In fact, it never considered fully the plaintiff's offer for two reasons: (1) plaintiff's offer was higher than that of the intervenor, and (2) plaintiff's offer was non–responsive with respect to the requirement of contiguous parking for Block A. Because of its failure to fully consider the plaintiff's offer, the defendant did not make a determination of the time which would be required to convert the Stallings Building into a building which would meet or exceed its specifications–as was done in the case of the Brown Marx Building. The record is not barren in this respect, however, as one of the judges of the Bankruptcy Court testified (and the court credits his testimony) that the Stallings Building "couldn't possibly be readied within the time period required."

### (d) Other Offerors

The Plaza Building Company submitted an offer to provide space for Block B, at the rate of $7.75 psf. The offer was unrespon-

---

**3.** The amendment related to certain matters not relevant to the issues in this cause.

**4.** The evidence is also clear that the defendant never considered the historical significance of the Brown Marx Building.

sive with respect to requirements for the handicapped and secured parking.

The Bank for Savings Building was offered, in separate proposals, for Block B (at $7.25 psf) and Block A (at $7.85 psf); but these offers were considered unresponsive with respect to the building's inability to meet the "high–rise" safety requirements.

The Phoenix Building was also offered, at a rate of $9.25 psf. The offer was non–responsive because it did not comply with the solicitation requirement of contiguous parking.

Thus, four (including the Stallings Building) of the six offers submitted in response to the solicitation were deemed by the defendant to be unresponsive.

### Acceptance Of The Offer Of The Intervenor

On May 29, 1980 the defendant's Realty Specialist responsible for the leased acquisition of space for federal agencies in Alabama recommended that the offer of intervenor Brush be accepted. This recommendation was based on an analysis of six major factors: ceiling height for courtroom space, contiguous parking for the courts, susceptibility of the design of the space offered to an efficient layout, delivery time, factors of award specified in the solicitation, and the rental rate at which the space was offered. Despite its position as second lowest offeror, the 500 Building was recommended because it

> "presently meets requirements for handicapped persons, can provide 10′ ceilings in Courtrooms, will provide contiguous parking for the courts and Secret Service. The design of space conforms to an efficient layout for both blocks, and the space can be delivered within the time frame required."

The recommendation was accepted by the defendant on May 30, 1980 and on June 9, 1980, the defendant notified the intervenor that his offer was accepted.

**5.** Under 36 C.F.R. § 60.11 buildings are to be nominated to the National Register by the concurrent action of the State (Historical) Preservation Officer and Federal Representatives.

### Defendant's Policy Concerning Utilization Of Historically Significant Buildings

Pursuant to a policy embodied in a February 28, 1978 intra–agency memorandum, the defendant's "interest in preserving historical properties still rests mainly with those actually on or eligible for the National Register." The defendant accords a preference only to such properties; and "[a]ny buildings that may possess some historical characteristics but that are not yet on or eligible for the National Register are clearly of a lesser status, and do not warrant the special considerations of [its] preferential leasing procedures." This policy is being followed by the defendant at the present time. Since the Brown Marx Building and the Stallings Building are neither listed on the National Register nor properly nominated [5] for inclusion on the register,[6] the defendant did not consider their historical significance in arriving at its decision that the order of the 500 Building should be accepted.

## DISCUSSION

### Applicability of the National Environmental Policy Act

The provisions of the National Environmental Policy Act, 42 U.S.C. § 4331, *et seq.* ("NEPA") come into play when two conditions co–exist: (1) a major federal action, having a (2) significant effect on the quality of the human environment.

In order to effect compliance with the Requirements of NEPA, the defendant has promulgated a series of regulations governing environment review for its actions. Under these regulations, an acquisition of less than 20,000 square feet of space in a structure substantially completed prior to the issuance of the solicitation for offers does not require an environmental impact statement.[7] The challenged procurement in

**6.** The defendant's position is that a building is eligible for the National Register only upon its nomination as such by a proper agency.

**7.** Under the regulation, such acquisitions are

**1384**

the instant cause involves roughly 16,000 square feet of occupiable space.

■ This Court therefore is being called upon to review GSA's threshold requirement that the acquisition of at least 20,000 square feet of leased space must be involved in order to trigger NEPA's provisions for "major federal action." The standard for judicial review of this agency regulation governing situations in which an environmental impact statement is to be filed is one of reasonableness. *Save Our Ten Acres v. Kreger*, 472 F.2d 463 (5th Cir. 1973); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

■ Considering all of the evidence, the court is of the opinion that the challenged regulation is a reasonable one. No substantial environmental issues were developed by the plaintiff's evidence, and no "unusual conditions" were established which would militate in favor of an environmental impact statement here where only 16,000 square feet is to be acquired. There simply was no showing that any greater demand or load on the environmental impact area of downtown Birmingham is created by this acquisition.

■ Moreover, the challenged action here relates more properly to the socio–economic environment of Birmingham, than to the physical environment. Unquestionably, the physical environment will not be affected one whit by the defendant's choice of the 500 Building or the Stallings Building. Under these circumstances, NEPA would not be implicated even if a major federal action were involved.

"categorically excluded because they normally do not meet any of the indicators of significance and they are routine; will not create greater demands or loads on environmental impact areas; allow the current agency action to continue; or do not alter physical conditions."

8. "NEPA was enacted in recognition of the effect that man's activities ... have on the "natural environment." 42 U.S.C. § 4331. The primary concern was with the physical environment resources of the nation. [Citing cases]. We do not mean to say that socio–economic effects can never be considered un-

In *Image of Greater San Antonio, Texas v. Brown*, 570 F.2d 517 (5th Cir. 1978) the Circuit squarely held that NEPA's "threshold requirement" is that of a primary impact on the physical environment;[8] socio–economic impact, standing alone, is insufficient to invoke NEPA.

Since the challenged action here is not a "major federal action" and does not impact on the physical environment, the defendant was not required to prepare and file an environmental impact statement under the provisions of NEPA.

### Implications Of The Public Buildings Cooperative Use Act

The Public Buildings Cooperative Use Act of 1976 ("PBCUA") 40 U.S.C. § 601 *et seq.*, deals with the construction, alteration, and acquisition of public buildings. Section 601 of the Act prohibits the construction of any public building by anyone other than the Administrator of the defendant GSA, "who shall construct such public building in accordance with [the] Act."

Plaintiff relies on § 601a of PBCUA, which requires the Administrator of GSA, in carrying out his duties under the Act to

(1) acquire and utilize space in suitable buildings of historic, architectural, or cultural significance, unless use of such space would not prove feasible and prudent compared with available alternatives.

Buildings of historic, architectural or cultural significance include, but are not limited to, buildings listed or eligible to be listed on the National Register of Historic Places.[9] 40 U.S.C. § 612a(4). Plaintiff also correctly

der NEPA. When an action will have a primary impact on the national environment, secondary socio–economic effects may also be considered, [Citing cases]. But when the threshold requirement of a primary impact on the physical environment is missing, socio–economic effects are insufficient to trigger an agency's obligation to prepare an [environmental impact statement]. [Citing cases]. *Id.*, at 522.

9. See 16 U.S.C. § 470(a), and the discussion of the National Historic Preservation Act *supra*.

notes that under the Act the GSA Administrator is required, whenever he undertakes a survey of the public building needs of the Federal Government within a geographical area, to identify historically, architecturally or culturally significant buildings which would be suitable to meet the public building needs of the Federal Government.[10] 40 U.S.C. § 611(c).

If the Act does apply in fact, then there is ample ground for plaintiff's assertion that PBCUA has not been complied with, for the defendant did not consider the historical significance of either the Stallings Building[11] or the Brown Marx Building.

■ However, this Court concludes that PBCUA is inapplicable to the challenged action, based on its judgment that the Act does not affect, in any way, the defendant's authority to *lease* buildings for other agencies of the Federal Government. The express language, the plain meaning, of the Act compels this conclusion: "Nothing in this Act [PBCUA] *shall be construed to limit or repeal . . . existing authorizations*

*for the leasing of buildings* by and for the General Services Administration . . . ." 40 U.S.C. § 615.[12] (emphasis added). Moreover, § 601a amended § 601 which, as shown earlier, deals only with the *construction* of *public* buildings.

The challenged action certainly does not relate to construction.[13] Nor does the action involve a "public building" within the meaning of the Act; for buildings owned by private entities are implicitly excluded from the statutory definition of the term, as they are not "on the public domain." 40 U.S.C. § 612. The legislative history of the 1959 enactment makes it clear that the statute was aimed at acquiring, constructing, altering, repairing, remodeling, extending buildings which would be under federal jurisdiction. *1959 U.S.Code Cong. & Admin. News, p. 2291.*

The defendant's general authority to enter into less–than–twenty year leases is conferred by 40 U.S.C. § 490(h)(1),[14] originally enacted in 1958. Had Congress de-

---

**10.** This provision requires the Administrator to identify and consider such buildings for acquisition or purchase by the Federal Government, "whether or not [such buildings are] in need of repair, alteration, or addition . . . ."

**11.** The consideration of whether the Stallings Building is a "suitable" building under PBCUA, is subsumed under the discussion of Executive Order 12072, *supra.* As shown in that discussion, the Executive Order was promulgated under the authority of 40 U.S.C. § 486, which was originally a section of the Federal Property and Administrative Services Act of 1949 in which PBCUA is also rooted.

**12.** The Court is aware that § 615, originally enacted in 1959, was a part of the Public Buildings Act of 1959. However, PBCUA, enacted in 1976, did not repeal the section and Congress obviously intended that it should apply to the subsequently–enacted PBCUA. For a discussion of the policy against repeal by implication and preference for clear and manifest expression of intent to repeal see *TVA v. Hill,* 437 U.S. 153, 189, 98 S.Ct. 2279, 2298, 57 L.Ed.2d 117 (1978); *Morton v. Mancari,* 417 U.S. 535, 549, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974); *Posados v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936).

**13.** While, to be sure, § 601a refers to the "acquisition" of suitable historically or architecturally significant buildings, the term acquire is legally defined:

"to gain by means . . . to get as one's own; to obtain by . . . purchase; to come to have. In law of contracts . . . to become owner of property; to make property one's own. To gain ownership of." *Black's Law Dictionary,* 5th Ed. 23.

An "acquisition" is to be distinguished from a "lease," which is legally defined as "any agreement which gives rise to relationship of landlord and tenant (real property) or lessor and lessee (real or personal property)." *Black's Law Dictionary,* 5th Ed. 800. A lease is precisely what is involved in the instant lawsuit; for the challenge here essentially relates to a "grant of [an] estate in real property for [a] limited term with conditions attached." *Id.*

**14.** This section states:

"The Administrator is authorized to enter into lease agreements with any person, co–partnership, corporation, or other public or private entity, which do not bind the Government for periods in excess of twenty years for each such lease agreement, on such terms as he deems to be in the interest of the United States and necessary for the accommodation of Federal agencies in buildings and improvements which are in existence or to be erected by the lessor for such purposes and to assign and reassign space therein to Federal agencies." *Id.*

sired to impose historical or architectural preservation requirements on the leasing of buildings by the defendant, such requirements would have been set forth in an appropriate subsection of Section 490. Congress assuredly has not chosen to do so.[15]

### Executive Order 12072

On August 16, 1978, President Jimmy Carter issued Executive Order 12072, relating to federal space management. The executive order was predicated on 40 U.S.C. § 486,[16] and it provides in relevant part that procedures for meeting federal space needs in urban areas shall include consideration of five alternatives, the second of which relates to utilization of buildings of historic, architectural or cultural significance, within the meaning of PBCUA. Executive Order 10272 ("EO") § 1–105(b). The other four alternatives are not directly related to the issue at bar.[17]

The executive order further requires the Administrator of the defendant to develop programs for implementing its policies "through the efficient acquisition and utilization of Federally owned and leased space." EO § 1–201. It requires the Administrator to "consider the efficient performance of the missions and programs of the agencies, [and] the nature and function of the facilities involved ...." EO § 1–203(a). Additionally, under the terms of the executive order, the Administrator is required to consult with appropriate federal, state and local government officials and "consider their recommendations for and objections to a proposed selection site or space acquisition." EO § 1–203(c). Unlike PBCUA, EO 10272 expressly covers facilities leased by the Government.[18]

■ As expressed in its uncodified guidelines, the defendant's policy of non–consideration of the historical, architectural or cultural status of buildings not listed on the National Register or formally nominated thereto does not comply with the executive order. The policy was promulgated five months prior to the effective date of the more expansive executive order, which does not limit consideration to those buildings actually listed on or formally nominated to the National Register. The Court finds that the defendant failed to comply with the executive order by its non–consideration of the historical and architectural status of the Stallings and Brown Marx Buildings and it also failed to comply with the requirements of the order when it did not consult with local government officials and consider their recommendations for and objections to the proposed sites for the Bankruptcy Court and the Secret Service.

An analysis of the suitability of a building must be made in assessing the ultimate effect of defendant's failure to comply with the executive order discussed above. From

15. If somehow the requirements of § 601a could be read into § 490, the Court would be presented with questions of whether the Stallings Building is a "suitable" building and of whether its use is "feasible and prudent compared with available alternatives." For the reasons outlined below, the Court would conclude that the building is not a "suitable" building; and, based on the facts as developed above, the Court would conclude that the use of the Stallings Building would not be feasible and prudent compared with the available alternatives.

16. "The President may prescribe such policies and directives, not inconsistent with the provisions of this Act, as he shall deem necessary to effectuate the provisions of this Act, which policies and directives shall govern the Administrator [of the GSA] and executive agencies in carrying out their respective functions hereunder." Id.

17. These include:
"(a) Availability of existing Federally controlled facilities....
(c) Acquisition or utilization of existing privately owned facilities.
(d) Construction of new facilities.
(e) Opportunities for locating cultural, educational, recreational, or commercial activities within the proposed facility." EO § 1–105.

18. "§ 1–302, Executive agencies which acquire or utilize Federally owned or leased space under authority other than the Federal Property and Administrative Services Act of 1949, as amended, shall conform to the provisions of this Order to the extent they have the authority to do so." Id.

a purely technical viewpoint, the plaintiff's building is unsuitable because its offer did not conform to the solicitation requirement of contiguous parking.[19] Additionally, the utilization of the 500 Building more conveniently satisfies the public parking needs of these agencies than would the use of the Stallings Building.

More significantly, the uncontroverted evidence establishes that the missions and programs of both the Bankruptcy Court in the Northern District of Alabama and the Regional Office of the United States Secret Service would be affected adversely should the Stallings Building be utilized rather than the 500 Building.

In the Court's judgment, this adverse effect on the efficient functioning of these agencies far outweighs any aesthetic values that may be preserved by the involuntary confinement of these agencies in the Stallings Building. Any consideration of the status of the Stallings Building as a historically and architecturally significant building under the terms of the executive order and applicable statutes is counter-balanced and indeed outweighed by consideration of the peculiar unsuitability of the building.

The National Historic Preservation Act

■ The question of whether the defendant is required to comply with the National Historic Preservation Act of 1966, 16 U.S.C. § 470(f),[20] turns on whether the Stallings and Brown Marx Buildings are "eligible for inclusion in the National Register." For it is clear that a federal agency is involved, and federal funds have been or will be expended on the challenged leasehold. It is

likewise undisputed that the Stallings and Brown Marx Buildings are not listed on the National Register; that the defendant has not considered the historical, architectural, or cultural status of these buildings; and that the Administrator of GSA has not afforded the Advisory Council on Historic Preservation "a reasonable opportunity to comment" with respect to the non–utilization of the Stallings and Brown Marx Buildings. 16 U.S.C. § 470f.

Until 1976, only buildings actually listed on the National Register prior to the approval of the expenditure of federal funds for a given project were covered by the Act. *Hart v. Denver Urban Renewal Authority*, 551 F.2d 1178 (10th Cir. 1977); *St. Joseph Historical Society v. Land Clearance for Redevelopment Authority*, 366 F.Supp. 605 (W.D.Mo.1973); *Wisconsin Heritages, Inc. v. Harris*, 460 F.Supp. 1120 (E.D.Wis.1978). However, the Act was amended in 1976 to include buildings not actually listed in the Register but which are nonetheless "eligible for inclusion in" the Register.

Under Title 36 C.F.R. § 800.2 a building is deemed "eligible" for the National Register if it meets the National Register Criteria. "National Register Criteria" include the standards "established by the Secretary of the Interior to evaluate properties to determine whether they are eligible for inclusion in the National Register," as set forth in Title 36 C.F.R. § 60.6.

The criteria set forth by the Secretary of the Interior for determination of eligibility[21] for the National Register apparently

---

**19.** The Court assumes that, had the challenged lease award been set aside, any subsequent offer of the Stallings Building would have included a provision for contiguous parking as required by the solicitation.

**20.** This section states:

"The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State ... shall, prior to the approval of the expenditure of any Federal funds on the undertaking ... take into account the effect of the undertaking on any ... building ... that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory

Council on Historic Preservation ... a reasonable opportunity to comment with regard to such undertaking." *Id.*

**21.** "The quality of significance in American history, architecture, archeology, and culture is present in districts, sites, buildings, structures, and objects of State and local importance that possess integrity of location, design, setting, materials, workmanship, feeling, and association, and

(a) That are associated with events that have made a significant contribution to the broad patterns of our history; or

(b) That are associated with the lives of persons significant in our past; or

are satisfied by both the Stallings Building and the Brown Marx Building; however, an actual determination of the buildings' eligibility has never been made or, for that matter, requested. Although neither building has been nominated to the National Register, both have been found to be "historically significant" by the Advisory Council on Historic Preservation, the agency created by the Act to advise the President and Congress, to make recommendations and reports, and to perform various other functions relating to historic preservation. 16 U.S.C. § 470j.

The Court agrees with the defendant's position that under these circumstances neither the Stallings Building nor the Brown Marx Building is "eligible for inclusion in the National Register". Not only have they not been nominated to the Register, they have not been determined by any federal or state agency to be eligible for nomination to or inclusion in the National Register.

The 1976 amendment to the Act, extending its coverage to buildings "eligible for inclusion on the Register", arose out of a Congressionally perceived need for comments by the Advisory Council not only with respect to undertakings affecting National Register properties, but on *"properties determined to be eligible"* as well. Senate Report, P.L. 94–422, 1976 U.S.Code Cong. & Admin.News, p. 2450. (emphasis added). The intent of Congress, it would therefore appear, was to afford some measure of protection to properties on which there has been some determination of eligibility for inclusion on the National Register.[22]

It follows that, since the Stallings Building and the Brown Marx Building have not been determined to be eligible for inclusion on the National Register, the notification requirements of the National Historic Preservation Act were not triggered by any action in the instant case.

### Alleged Violations Of Applicable Procurement Regulations

The plaintiff makes various complaints concerning an alleged failure by the defendant to comply with applicable procurement regulations and laws. These allegations range from a claim that the defendant did not justify its reasons for not utilizing competitive bids to a complaint alleging an impropriety in the defendant's consideration of the Bankruptcy judges' expressed support for the 500 Building and their disdain for the Stallings and Brown Marx Buildings.

Plaintiff complains that the defendant improperly considered the expressed preference of the Bankruptcy judges for the 500 Building; yet the very executive order on which it bases one of its causes of action requires the defendant to "[c]onsult with appropriate Federal . . . officials and consider their recommendations for and objections to a proposed selection site or space acquisition." Executive Order 12072 § 1–203(c). It complains that the defendant "chose to ignore the public transportation criterion"; but the evidence totally failed to substantiate that contention.

While the plaintiff complains that the defendant did not inform it of the specific date and time of the closing of negotiations,[23] the evidence abundantly establishes that good faith negotiations were conducted

---

(c) That embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or

(d) That have yielded, or may be likely to yield, information important in prehistory or history". 36 C.F.R. § 60.6.

**22.** A literal construction of the phrase "eligible for inclusion in the National Register" would, under the broadly stated criteria for eligibility

set forth in 36 C.F.R. § 60.6, lead almost inescapably to the conclusion that every building over fifty years old in this country is eligible for inclusion on the Register. Virtually all of the skyscrapers of the urban centers of the nation would apparently be eligible. Surely Congress did not intend that each such building be placed on the National Register.

**23.** See 41 C.F.R. § 1–3.805–1; *Airco, Inc. v. Energy Research and Development,* 528 F.2d 1294, 1297–98 (7th Cir. 1975).

with the plaintiff. In the negotiations of May 12, 1980, the defendant requested and plaintiff submitted what it knew to be its final and best offer, $7.02 per square foot of usable space for the premises. On that same date, the intervenor submitted its lower final and best offer.[24]

The plaintiff's contention that it was not informed by the defendant that its offer was "void" because of its failure to respond to the solicitation's contiguous parking requirement falls under its own weight, in view of the testimony of its General Manager that on May 12 the defendant's Realty Specialist, after asking for and receiving his final and best offer, told him that his bid was unresponsive with respect to the contiguous parking requirement.

■ The plaintiff contends that the defendant failed to justify its reasons for not taking purely competitive bids. If the defendant had utilized the advertised competitive bid procedure set forth in 41 U.S.C. § 253, the plaintiff's bid would properly have been rejected as two other bids were lower than the one submitted by plaintiff. Therefore plaintiff lacks standing to raise this particular issue.[25] *South Suburban Safeway Lines, Inc. v. City of Chicago*, 416 F.2d 535, 537 (7th Cir. 1969); *Duba v. Schuetzle*, 303 F.2d 570, 574 (8th Cir. 1962).

■ The standard of review of the award is the "arbitrary or capricious" standard; *Keco Industries, Inc. v. United States*, 492 F.2d 1200, 203 Ct.Cl. 566 (1974); *Burroughs*

*Corp. v. United States*, 617 F.2d 590, 598 (Ct.Cl.1980). In challenged government procurement actions, an even heavier burden of arbitrariness, caprice, or unreasonableness is imposed because of the "strong public interest in avoiding disruptions in procurement, and for withholding judicial interjection unless it clearly appears that the case calls for an assertion of an overriding public interest 'in having the agencies follow the regulations which control government contracting.' " *Hayes International Corp. v. McLucas*, 509 F.2d 247, at 258, (5th Cir. 1975), citing *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1300 (D.C. Cir.1971). This case does not call for an assertion of such an overriding public interest.

■ The plaintiff has not carried the usual burden of showing arbitrariness and unreasonableness in the actions of the defendant. Substantial compliance with the applicable procurement statutes and regulations has been abundantly shown; no arbitrariness, caprice, ill–will, bad faith or other improper motive or abuse of discretion has been demonstrated. This case is rather the usual one in which the "strong public interest in avoiding disruptions in [Government] procurements and for withholding judicial interjections ... should carry the day."

### The Laches Defense [26]

Since this action is one in which injunctive relief is sought, the doctrine of laches is

---

**24.** Defendant's Realty Specialist could not specifically recall whether she informed any of the offerors that May 20, 1980, was the deadline for all negotiations. The timing of the final offers and revisions both by plaintiff and intervenor, together with the testimony of the Realty Specialist and the plaintiff's General Manager (where conflicts exist between their respective testimonies, the Court credits the testimony of the Realty Specialist), convince the Court that the offerors were well aware of the impending deadline.

**25.** Alternatively, the Court finds and concludes that the award of the instant lease was "made on a competitive basis to the maximum practicable extent." 41 C.F.R. 1–3.101(d). The defendant advertised its need for space in a Birmingham daily newspaper of general circula-

tion and therein publicly solicited offers; responded to inquiries of all interested parties; issued a solicitation to approximately eighteen interested parties; negotiated with all offerors and otherwise sought competitive procurement over a period of three months; received six offers; and accepted the second lowest after rejecting the lowest offer because of its failure to conform to the solicitation requirements. Under these circumstances, and time being of the essence, the Court is of the opinion that 41 U.S.C. § 253 and 41 C.F.R. 1–3.101(d) were substantially complied with by the defendant.

**26.** This discussion is deemed relevant only because the Court has concluded that the defendant's policy of nonconsideration of buildings not actually listed on or formally nominated to the National Register does not comply with

applicable. The intervenor, being the lowest responsible offeror, was notified on June 9, 1980, that his offer had been accepted. As all of the parties and offerors were well aware, time was of the essence. The Secret Service's lease was to expire three weeks later; and the Bankruptcy Court's principal lease would expire less than four months thereafter. The plaintiff was notified of the award at roughly the same time as the intervenor.

Intervenor immediately commenced to perform his responsibilities under the terms of the award. He was required to substantially modify the interior of the 500 Building. Within thirty days after receiving the plans for the Secret Service offices, he had completed the renovations and the building was ready for occupancy by that agency–at a substantial cost to intervenor. After receiving plans for the Bankruptcy Court, the intervenor immediately began to renovate his building for use by that Court.

Plaintiff, being well aware of the time factors, took no action for nearly two months after the award had been made by the defendant.[27] It was precisely during this time that intervenor was expending substantial sums of money and amounts of time in performing under the then unchallenged award.

Moreover, intervenor was not made a party to this action by plaintiff, although clearly he had a vital and unrepresented interest in this litigation and disposition of this action in his absence would definitely impede his ability to protect that interest. Thus, for an additional two weeks after this lawsuit was filed, intervenor, having no actual knowledge of its filing, may well have continued to make substantial investments of time and money in performing the terms and conditions of the award.

The Court must consider three factors in passing on the defendant and intervenor's assertion that plaintiff's claims are barred by laches. These include: (1) whether there was delay in asserting a right or claim; (2) whether the delay is excusable, and (3) whether there has been undue prejudice against the defendant and/or intervenor because of the unexcused delay. *Save Our Wetlands v. U. S. Army Corps of Engineers*, 549 F.2d 1021 (5th Cir. 1977); *cert. denied*, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977); *Ecology Center v. Coleman*, 515 F.2d 860, 867 (5th Cir. 1975). The Court finds and concludes, based on a consideration of these factors, laches also bars the various causes of action asserted by the plaintiff.

Surely, plaintiff did not bring this action within a reasonable time after it learned of the June 9, 1980 award, in view of its knowledge of the time constraints inherent in the situation. By the time the action was brought, the intervenor's building was ready for occupancy by the Secret Service.

Plaintiff's delay in bringing the action is not excused because of an alleged inaccessibility of the defendant's files until roughly a month after the award was made. First, the plaintiff has not shown that he acted diligently and vigorously in attempting to obtain the files. Secondly, plaintiff was already in possession of much of the information which gave rise to this lawsuit *prior* to reviewing the defendant's files. And finally, the defendant delayed by one full month after it was permitted access to the defendant's file the bringing of this action. No other excuse was offered by the plaintiff for its delay in bringing this action.

---

Executive Order 12072. See pp. 18–20, where the Court, in balancing the equities involved, concluded that it would be inappropriate to set aside the award because of non–compliance with two sections of the order. In this matter, considering the one or two situations in which the defendant may not have fully complied with federal regulations, the Court would, in the furtherance of the public interest in an operational Secret Service and Bankruptcy Court, decline to enjoin the award to interve-

nor. *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1271 (5th Cir. 1978); *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289 (D.C. Cir. 1971).

**27.** Significantly, plaintiff knew that its offer was considered by defendant to be unresponsive, yet it failed, until sometime *after* the award had been made to intervenor, to make its offer responsive by offering contiguous parking spaces.

That the intervenor will suffer undue prejudice should the Court enjoin the award is unquestioned. He has converted nearly 17,000 square feet of his building into single–purpose space, in record time and at great expense. He has been required to hold this space for the federal agencies involved from the time he submitted his award in March 1980 to the present time and he has been effectively precluded from seeking other tenants. He would lose the benefit of anchor tenants of the kind alluded to by plaintiff in the presentation of its case; and that loss would be incalculable. He would generally suffer damages not susceptible of precise calculation from a monetary standpoint and which would therefore be unrecoverable. The equity powers of this Court will not suffer such an inequitable result.

### SUMMARY AND CONCLUSION

In summary, the Court concludes that for the reasons set forth above, neither the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, the Public Buildings Cooperative Use Act, 40 U.S.C. § 601 *et seq.*, nor the National Historic Preservation Act, 16 U.S.C. § 470 *et seq.* is applicable to the challenged procurement action. Alternatively, and to the extent that the National Historic Preservation Act may be deemed applicable, the Court declines, in the exercise of its discretion and in the public interest, to issue an injunction setting aside the award of the lease to the intervenor for failure of the defendant to comply with the reporting provisions of the Act.

The Court concludes that under the applicable standard of judicial review of Government procurement actions, the plaintiff has failed to carry its burden of establishing arbitrary or capricious action by the defendant with respect to its adherence *vel non* to the applicable procurement regulations embodied in the Code of Federal Regulations.

The Court further concludes that the defendant has failed to comply with those provisions of Executive Order 12072 which require that alternative consideration be given to the utilization of buildings of historic, architectural, or cultural significance and that appropriate local government officials be consulted and their recommendations in favor of or against a proposed site be considered. This Court declares the defendant's policy and practice in this regard to be violative of the said executive order. In all other respects, the defendant, however, has complied faithfully with the provisions of the said executive order.

The Court additionally concludes that the doctrine of laches bars the fairly drastic relief herein sought by the plaintiff–to wit, the voiding of the award of the contract of the intervenor.

Accordingly a separate order embodying these conclusions shall issue.