2000 D.S.D. 12

**ROSEBUD SIOUX TRIBE, a federally recognized Indian Tribe; and Sun Prairie, a Nebraska general partnership, Plaintiffs,**

**v.**

**Kevin GOVER, Assistant Secretary, Indian Affairs, U.S. Dept. of Interior; and Bruce Babbitt, Secretary of the U.S. Dept. of Interior, Defendants,**

**Concerned Rosebud Area Citizens, South Dakota Peace and Justice Center, Prairie Hills Audubon Society, and Humane Farming Association, Intervenors.**

**Civ. 99-3003.**

United States District Court,
D. South Dakota,
Central Division.

Feb. 3, 2000.

Kenneth R. Dewell, Terry L. Pechota, Viken, Viken, Pechota, Leach & Dewell, Rapid City, SD, Charles M. Thompson, Brent A. Wilbur, Neil K. Fulton, May, Adam, Gerdes & Thompson, Pierre, SD, Vernle C. Durocher, Jr., Gregory A. Fontaine, Dorsey & Whitney, Minneapolis, MN, for plaintiffs.

Cheryl Schrempp Dupris, U.S. Attorney's Office, Pierre, SD, R. Anthony Rogers, U.S. Department of Justice, Environmental & Natural Resources Div., General Litigation Section, Washington, DC, for defendants.

## ORDER GRANTING PERMANENT INJUNCTIVE RELIEF

KORNMANN, District Judge.

[¶ 1] On March 3, 1999, the Court entered an order granting a preliminary injunction in this matter, Doc. 53. The parties were permitted to file simultaneous supplemental briefs on issues related to permanent injunctive relief. On April 12, 1999, plaintiffs filed a supplemental brief, Doc. 65. Defendants and intervenors filed motions for summary judgment, Docs. 68 and 73, which the Court deemed to be procedurally improper and denied as moot, Doc. 109. The Court also denied defendants' and intervenors' requests to supplement the administrative record.[1] On April 21, 1999, Defendants and intervenors filed

1. "Any attempt to introduce or rely on new evidence or materials other than published case law is also inappropriate. Not only did counsel for defendants and intervenors fail to indicate a need to supplement the administrative record at the close of the hearing on February 18, 1999, but they also made affirmative representations to the Court that they would rely on the administrative record evidence submitted prior to and during that hearing. They do not now offer any convincing justification to support their change of position nor any persuasive arguments to allow the supplementary documents to become part of the record. Allowing the introduction of or reliance on any supplementary documents in the briefs addressing permanent injunctive relief would deprive plaintiffs of their right to rebut or object to such documents." (Doc. 109 at 2).

supplemental briefs, Docs. 79 and 81. The findings of fact from the Court's order granting a preliminary injunction are restated below.

## BACKGROUND

[¶ 2] In the spring of 1998, the Rosebud Sioux Tribe (the "Tribe") and Sun Prairie agreed to negotiate a land lease (the "lease") for the development of a multi-site hog production facility (the "project") on tribal trust land in Mellette County, South Dakota. A public informational meeting regarding the project was held in Norris, South Dakota, on June 15, 1998. The BIA office in South Dakota contracted with RESPEC of Rapid City, South Dakota, to prepare a draft Environmental Assessment ("EA") for the project which draft EA was released in late June of 1998. The comment period expired on July 29, 1998. Based on the final EA that was released on Friday, August 14, 1998, BIA Rosebud Agency Superintendent Larry Burr issued a Finding of No Significant Impact ("FONSI") that same day and notice of the FONSI was published in local newspapers of general circulation the following week.

[¶ 3] On August 19, 1998, the Rosebud Sioux Tribal Council adopted Tribal Resolution # 98-203 which authorized the execution of the lease for the project. The lease between the Tribe and Sun Prairie was executed on September 8, 1998. On September 16, 1998, Cora Jones, Aberdeen Area. Director for the BIA, approved the lease pursuant to 25 U.S.C. §§ 81 and 415 and 25 C.F.R. § 162.5 (1998). The lease was recorded with the BIA Aberdeen Area Land Title and Records Office on September 17, 1998. On or about September 21, 1998, the Tribe and Sun Prairie commenced construction on so-called site 1 of phase I of the project. The project consists of two phases. Phase I consists of three finishing sites to be used to fatten hogs for market. Phase II consists of five sow sites and five additional finishing sites. As of the date of the hearing on plaintiffs' application for a preliminary injunction, the Tribe, to some extent, and Sun Prairie to a great extent, had expended approximately $5,000,000 on construction for site 1, which was substantially complete.

[¶ 4] Letters from various parties concerned about the project were sent to Area Director Jones, Assistant Secretary Gover (the "Assistant Secretary"), and others during the month of September of 1998, but no administrative appeal of the lease approval was ever served or filed. No letter of protest even referred to the lease. Comments from the Environmental Protection Agency ("EPA") on the draft EA were not received until September 1, 1998, even though a copy of the draft EA was received by EPA during the first or second week of July. The EPA had an opportunity to timely respond but failed to do so. Additional EPA comments on the project were received on October 15, 1998, after the lease had already been approved. Local BIA officials met with EPA staff on at least four different occasions between September of 1998 and January of 1999 to address the concerns EPA had with the project.

[¶ 5] On November 23, 1998, intervenors in this present action sued the federal government in the United States District Court for the District of Columbia, seeking to suspend or enjoin the effectiveness of the BIA's approval of the lease and alleging violations of the National Environmental Protection Act ("NEPA") and the National Historic Preservation Act ("NHPA"). *Concerned Rosebud Area Citizens v. Babbitt,* 34 F.Supp.2d 775 (D.D.C. 1999) (hereinafter "D.C. litigation"). The government moved to transfer venue to the District of South Dakota, arguing that the Tribe and Sun Prairie were indispensable parties,[2] and submitted affidavits of then Rosebud Sioux Tribal President Norman G. Wilson and Rich Bell, general partner of Sun Prairie, that set forth the interests of the Tribe and Sun Prairie in participating in the litigation. The court in the District of Columbia denied the gov-

2. Intervenors challenge this assertion by defendants. (Intervenors' supp. br. at 9 n. 8.)

ernment's motion to transfer. The administrative record related to the project EA and FONSI was received by the Department of Justice on January 25 and 26, 1999. On January 27, 1999—one day after the government filed an answer (drafted by present counsel for defendants in this action in the District of South Dakota) in the D.C. litigation denying any violations of NEPA or NHPA in connection with the project—Assistant Secretary Gover sent a letter to the Tribe stating that the BIA's approval of the lease for the project was void for failing to fully comply with NEPA. The parties to the D.C. litigation then entered into a joint stipulation of dismissal on January 28, 1999, which cited the Assistant Secretary's letter voiding the lease approval, and the court dismissed that case without prejudice.

[¶ 6] The Tribe and Sun Prairie initiated the instant action, challenging the Assistant Secretary's authority and decision to void the lease and seeking a declaration that the EA prepared for the project complied with NEPA. A telephonic hearing on plaintiffs' motion for a temporary restraining order, Doc. 3, was held on February 9, 1999. The Court orally granted the motion during the telephonic hearing and issued a written temporary restraining order, Doc. 16, on February 11, 1999. The Court, pursuant to Fed.R.Civ.P. 65(a)(2), ordered the consolidation of the hearing on the application for a preliminary injunction with the trial on the merits.[3] A hearing was held on February 17–18, 1999. Prior to the hearing, the Court granted a motion to intervene, Doc. 21. At the conclusion of the hearing, the Court orally extended the temporary restraining order for ten days, pursuant to Fed.R.Civ.P. 65(b). The Court also issued a second temporary restraining order, Doc. 47, on February 18, 1999, *nunc pro tunc* February 26, 1999, prior to granting the preliminary injunction on March 3, 1999.

## DECISION

### I. Standing

[¶ 7] In an attempt to expediently and effectively address the initial matters

3. Intervenors contend in their supplemental brief that although the court had authority to conduct an evidentiary hearing on the plaintiffs' request for a preliminary injunction, the Court improperly invoked Rule 65(a)(2) because cases involving challenges to agency decisions are limited to the administrative record and do not require a "trial" on the merits. (intervenors' supp. br. at 12 n. 10.) First, on February 8 and 9, 1999, the Court informed the parties of its intent to consolidate the hearing on the application for a preliminary injunction with the trial on the merits pursuant to Fed.R.Civ.P. 65(a)(2). During the hearing, which commenced on February 17, 1999, the Court reiterated that the hearing was to be consolidated so as to ensure that all parties understood the procedure, and no party objected. At the conclusion of the hearing on February 18, 1999, counsel for all parties represented to the Court that all of the relevant evidence had been introduced and was part of the record upon which the Court could issue a ruling on the plaintiffs' request for permanent injunctive relief. (Tr.Prelim.Inj. Hr'g at 367–69.) Intervenors' objection at this stage is untimely in light of the adequate notice given as to consolidation and earlier opportunities to object. Second, intervenors cite no authority to support their objection and appear to adopt a reading of Rule 65(a)(2) that ignores its purpose: "[T]o consolidate the proceedings will tend to expedite the final disposition of the action. It is believed that consolidation can be usefully availed of in many cases. *** [R]epetition can be avoided with an increase of efficiency in the conduct of the case and without any distortion of the presentation of evidence by the parties." Fed.R.Civ.P. 65, Advisory Committee Notes, 1966 Amendments; *see also Birmingham Realty Co. v. General Services Admin.*, 497 F.Supp. 1377 (N.D.Ala.1980) (involving a challenge to GSA's award of a lease as arbitrary and capricious in which the district court consolidated the preliminary hearing with the trial on the merits of the case pursuant to Fed.R.Civ.P. 65(a)(2)). The rule was invoked in the instant case to ensure that all interested parties were represented, that all relevant documents were made part of the administrative record, and that relevant testimony as to all administrative actions was received. In short, the rule was invoked to not only ensure due process, but to pursue the most efficient manner of resolving all of the issues involved in this matter, especially given the procedural deficiencies that preceded the proceedings in this Court.

posed by this litigation, the Court granted intervenors' motion to intervene, Doc. 21, to ensure that all parties with an interest in this matter were adequately represented. In deciding to allow intervention, the Court gave great weight to the fact that, in the D.C. litigation, intervenors were plaintiffs. The Court now will briefly analyze the question of intervenors' standing in this litigation even though the parties did not choose to address this issue and were not asked to address this issue in their simultaneous briefs.

[¶ 8] An association may sue on behalf of its members if it demonstrates that (1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) the claims asserted and relief requested do not require the participation of individual members in the lawsuit. *See United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 553, 116 S.Ct. 1529, 1534, 134 L.Ed.2d 758 (1996). In this case, intervenors are citizens' groups who, as mentioned, were plaintiffs in a related lawsuit in the United States District Court for the District of Columbia.

[¶ 9] As to the first element, to meet Article III's "case or controversy" requirement, it is the burden of each intervenor to prove: (1) injury in fact, (2) causation, and (3) redressability. *See, e.g., Campbell v. Minneapolis Public Housing Authority,* 168 F.3d 1069, 1073 (8th Cir. 1999) *citing Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 118 S.Ct. 1003, 1016–17, 140 L.Ed.2d 210 (1998). Additionally, the Court must consider the prudential requirements for standing, including a requirement that intervenors' claims fall within the "zone of interests" protected by the relevant statutory or constitutional provision. *See, e.g., Friends of the Boundary Waters Wilderness v. Dombeck,* 164 F.3d 1115, 1125 (8th Cir.1999). Intervenors allege that the "injury in fact" is the potential nullification of the order approving the joint stipulation for dismissal filed in the D.C. litigation (Intervenors' mem. supp. mot. intervene, Doc. 18, Attach. A). The stipulation was premised on the Assistant Secretary's letter purporting to void the lease between the Tribe and Sun Prairie and purporting to prevent further construction of the project until an environmental impact study was completed. The second and third requirements of constitutional standing are easily satisfied: the initiation of this litigation by plaintiffs challenges the validity of the Assistant Secretary's decision to void the lease and a decision by this Court in favor of defendants would retain the power and effect of the Assistant Secretary's action and prevent plaintiffs from going forward with the project.

[¶ 10] The second element of associational standing—namely that the interests sought to be protected are germane to the organization's purpose—is related to the "zone of interests" analysis. Intervenors allege an interest in the protection and preservation of the environment and of cultural resources, which interests are undoubtedly within the "zone of interests" protected by NEPA and NHPA. In addition, the Eighth Circuit has recently held that because environmental reviews under NEPA require consideration of social and economic effects, *see, e.g.,* 42 U.S.C. §§ 4331(a), (b)(2), and (b)(5); 40 C.F.R. §§ 1508.27(a) and 1508.8, the "zone of interests" encompasses concerns regarding economic and social consequences. *Friends of Boundary Waters,* 164 F.3d at 1125–27. Again, as the issue of standing was not briefed by the parties, the Court must speculate to a certain degree as to which interests each intervening organization may claim to assert. However, under the requirements set forth above, the Court finds that the interests intervenors seek to protect are germane to their respective purposes and that their claims arguably fall within the zone of interests protected by NEPA and NHPA.

[¶ 11] Finally, it does not appear that anything in this lawsuit requires partic-

ipation by individual members of the intervenor organizations and the third element of associational standing is thus satisfied. The Court finds that intervenors have standing to challenge the sufficiency of the EA as a basis for the FONSI.

## II. The Assistant Secretary's Authority to Void the Lease

[¶ 12] Plaintiffs contend that the Assistant Secretary lacked any statutory or regulatory authority to unilaterally void the lease. They rely primarily on the absence of any administrative appeal and the failure of defendants to offer any testimony or evidence during the preliminary injunction hearing to explain the Assistant Secretary's action. Plaintiffs further argue that defendants and intervenors fail to demonstrate that 43 C.F.R. § 4.5, which allows the Secretary and Director to assume jurisdiction over a matter or to review decisions made by lower ranking officials, confers such "reserved powers" upon an Assistant Secretary and, even if such power could be exercised, the Assistant Secretary did not follow the appropriate procedures—i.e. providing written notice to the parties and to appropriate agency personnel, requesting and reviewing the administrative record, and providing a written decision. *See* 43 C.F.R. § 4.5(c). Defendants respond that "[a]n administrative agency has the inherent power to reconsider its decision, regardless of whether the applicable statute and agency regulations expressly provide for such review" and that such power is not vested exclusively in the Secretary (Defs.' supp. br. at 6–7). They cite various cases in which such authority has been exercised to cure prior erroneous determinations or to cancel leases that fail to comply with applicable law. Defendants claim that much of the case law suggests that an agency's inherent authority often involves *sua sponte* reconsideration, but fail to cite a single case in this regard.[4] Intervenors only briefly address this issue in their supplemental brief opposing permanent injunctive relief,[5] relying on BIA NEPA Handbook 4.4D which states that "[c]ontroversial EAs may be reviewed by the Central Office." (AR 3:0443). Although no procedures or requirements for such review are included in this provision, the legitimacy of the review process is similarly dependent on basic and inherent due process principles.

[¶ 13] As previously discussed in the order granting a preliminary injunction, no proper administrative appeal of the Area Director's decision to approve the lease was ever filed. Assuming arguendo that any of the letters filed in opposition to the project satisfied the notice, service and filing requirements set forth in 25 C.F.R. §§ 2.9–2.14, the Assistant Secretary did not take any action with respect to these "appeals" according to the procedures outlined in 25 C.F.R. § 2.20, such as directing a reconsideration. The authority for the Assistant Secretary's decision may derive from the "reserved powers" provision of 43 C.F.R. § 4.5(c), but the parties disagree as to whether or not this provision may be invoked by the Assistant Secretary as it makes reference only to the "Secretary or Director." Assuming that, under the general principles of the delegation doctrine, the Assistant Secretary did have authority to assume jurisdiction over the matter or to review the decisions of the local BIA officials, but would have been bound to follow the requirements of the regulation

4. Defendants also make the rather specious argument that "reconsideration was not initiated *sua sponte* by the Assistant Secretary; rather, it was the direct result of substantive questions regarding the validity of the lease and its underlying NEPA documents being raised by members of the public, Tribal members, citizen groups and other government agencies." (Defs.' supp. br. at 11). If reconsideration were so easily triggered, the inherent authority to reconsider would be virtually unlimited and there would be no reason for the regulations governing formal administrative appeals or petitions for reconsideration.

5. Intervenors earlier argued that the Assistant Secretary's decision was "squarely within his authority" but failed to cite any authority to support this contention (Doc. 29 at 6).

in exercising any inherent authority, he clearly did not adhere to the procedures outlined in § 4.5(c). Defendants argue that, assuming the requirements of § 4.5(c) apply to the Assistant Secretary, "[t]he parties and appropriate agency personnel were provided actual notice that the lease approved was the subject of a legal challenge and, in the context of that litigation, was being reviewed by the Assistant Secretary, the administrative record was requested, a review was conducted, and a written decision was issued. The plain language of the regulation does not require that the written decision include an analysis of the decision, findings of fact or conclusions of law." (Defs.' supp. br. at 18.) However, as previously addressed in the order granting preliminary injunctive relief, this argument strains any reasonable interpretation of the regulation and is contrary to its purpose—to guarantee due process to any interested party or agency official and to provide a basis on which the reconsideration decision can be reviewed.

[¶ 14] In support of the position that the Assistant Secretary had authority to void the lease, defendants focus their argument on an agency's inherent authority to reconsider its decisions. The Court acknowledges that administrative agencies generally have inherent authority to reconsider their decisions, despite the apparent lack of Eighth Circuit precedent on the issue. Such authority is not, however, unlimited and it is assumed that an agency will adhere to basic principles of due process in undertaking a reconsideration. *See, e.g., Belville Mining Co. v. United States,* 999 F.2d 989, 997–98 (6th Cir.1993) (holding that "where there is no express reconsideration authority for an agency ... the general rule is that an agency has inherent authority to reconsider its decision, provided that reconsideration occurs within a reasonable time after the first decision ... [and] subject to certain [other] limitations."). The Court is not persuaded by the case law cited by defendants in support of their argument that the Assistant Secretary acted within the scope of his inherent authority. As with both *Sangre de Cristo Dev. Co. v. United States,* 932 F.2d 891 (10th Cir.1991), and *Gray v. Johnson,* 395 F.2d 533, 537 (10th Cir.), *cert. denied,* 392 U.S. 906, 88 S.Ct. 2056, 20 L.Ed.2d 1364 (1968), which holdings were addressed in the preliminary injunction order, the cases cited by defendants are readily distinguished based on the procedural stance of the parties. These cases involve either decisions made within the context of administrative appeal proceedings or other recognized procedures, such as a petition for reconsideration, that extend proper notice and fair hearings prior to the termination, rescission, or voiding of leases or contracts.

[¶ 15] In this case, the Assistant Secretary "deviated from firmly established procedures." *Woods Petroleum Corp. v. Department of Interior,* 47 F.3d 1032 (10th Cir.1995). Defendants contend, without citing any authority, that because alleged NEPA violations are resolved by reviewing the administrative record, due process does not require that the parties to the lease be given an opportunity to be heard. This rationale is simply unpersuasive. To his credit, the Assistant Secretary attempted unsuccessfully to facilitate plaintiffs' participation in the D.C. litigation and in the events preceding his decision to void the lease. Nothing in the record, however, suggests that the Assistant Secretary was prohibited in any way from acting within the existing regulations to either assume jurisdiction over the matter or to explicitly exercise the authority to reconsider the challenged decision independent of the pending litigation. It sets an extremely dangerous precedent to act outside the bounds of established procedures and to internally reconsider an agency action within the context of litigation as the parties to the lease, who had already spent more than $5,000,000 in reliance on government action and approvals, "watch from the sidelines."

[¶ 16] Beyond any concerns related to the lack of due process, applying the reasoning of the Sixth Circuit in *Belville*—a case cited by defendants—when applied to

the particular facts of the present case, also serves to support a finding that the Assistant Secretary did not have authority to reconsider the final decision of BIA Area Director Jones to approve the lease between the Tribe and Sun Prairie. The Court quoted *McAllister v. United States,* 3 Cl.Ct. 394, 398 (1983), as follows:

> Barring a showing of error, an agency may reconsider its final decision only if the reconsideration is timely and the parties have not adversely changed their positions in reliance on that decision ... *If the parties act on the initial decision, however, and if the agency knows they will act, then the agency may reverse its initial decision only upon a showing that it was erroneous.*

999 F.2d at 999 (emphasis added); *see also Confederated Tribes of the Warm Springs Reservation of Oregon v. United States,* 177 Ct.Cl. 184, 1966 WL 8893 (1966) (stating that it was "especially dangerous" for an agency to reconsider an earlier decision when there had been "reliance on the assumed finality of the decision," but holding that because "the initial determination had not passed beyond [the Commission's] control," there could be no presumption of finality). In other words, because the Tribe and Sun Prairie did act on the Area Director's approval of the lease and the agency knew that construction on the Project would begin immediately if no appeals were filed, the Assistant Secretary's decision to void the lease is valid only if the EA was found to be insufficient.

[¶ 17] As previously discussed, no administrative appeals were filed within the 30 days prescribed by 25 C.F.R. § 2.9(a); thus, the Area Director's approval of the lease became the agency's "final decision." *See* 25 C.F.R. § 2.6(b). There is no dispute that the Tribe and Sun Prairie acted on this final decision and began construction on the project at the end of September. Therefore, the second portion of the *McAllister* decision quoted above is triggered and a showing that the initial decision was erroneous is required. However, even if we assume that the parties had not adversely changed their positions in reliance on the lease approval and there was no suggestion or showing that the lease approval was erroneous, the Assistant Secretary could only have reconsidered the "final decision" if the reconsideration was timely. The relevant factors cited in *Belville* to determine whether or not an agency reconsideration decision was timely include the following: (1) the complexity of the decision; (2) whether the decision was factually or legally based; (3) whether the agency acted according to its general procedures for review; (4) whether the express time limit for appeals set forth in the regulations had run; (5) whether legally cognizable property interests had arisen through the initial decision; (6) whether the plaintiff had acted in reliance on the initial decision; (7) whether the agency had attempted to use a pretext to justify reconsideration; and (8) the probable impact of an erroneous agency decision absent reconsideration. 999 F.2d at 1001. Applying these factors to the particular facts of this case set forth above, the Court finds that the nearly five-month delay between the decision to approve the lease and the Assistant Secretary's letter declaring the lease void renders the Assistant Secretary's reconsideration untimely and thus invalid.

[¶ 18] The Assistant Secretary's letter indicates that NEPA requirements were likely not met but the letter is conclusory and offers absolutely no legal analysis or factual explanation as to the inadequacy of the EA. It fails to provide any rational showing that approval of the lease and issuing the FONSI were erroneous. This is precisely plaintiffs' complaint—that the Assistant Secretary failed to offer specific reasons as to how the EA was insufficient under NEPA. Therefore, under the *Belville* holding, the inquiry as to the Assistant Secretary's authority to reconsider and reverse the decisions to issue the FONSI and approve the lease is thus inextricably linked to the Court's ultimate determination as to whether or not the EA is sufficient under NEPA. For reasons set forth in Section V, the Court finds that the EA is sufficient, the decision not to pre-

pare the Environmental Impact Statement (EIS) was not arbitrary and capricious, and thus the Assistant Secretary had no authority to reconsider the FONSI and to void the lease.

### III. The Validity of Assistant Secretary Gover's Decision to Void the Lease

[¶ 19] Assuming arguendo that the Assistant Secretary had the authority to void the lease between the Tribe and Sun Prairie, his action would constitute a "final decision" for the agency, subject to judicial review. 25 C.F.R. § 2.6(c). The question is whether he properly exercised any such authority. The standard of review to be applied is whether his decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Plaintiffs state that an agency has a duty to examine relevant data and articulate a satisfactory explanation for exercising its discretion, including "a rational connection between facts found and choice made." *Motor Vehicle Mftrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 48, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)), *cert. denied,* 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987). They argue that it is undisputed that the Assistant Secretary did not review the administrative record prior to his decision to void the lease and that he did not provide any explanation for the incongruity between his decision and defendants' Answer in the D.C. litigation which Answer denied the allegations of any violation of NEPA or NHPA. *See Seldovia Native Ass'n, Inc. v. Lujan,* 904 F.2d 1335, 1346 (9th Cir.1990) (holding that an agency can change its view but only "so long as the agency acknowledges and explains the departure from its views"). Plaintiffs also contend that defendants' failure to call witnesses or to present evidence at the preliminary injunction hearing implies that no legally valid explanation for the Assistant Secretary's decision exists. *See, e.g., Kostelec v. State Farm Fire & Cas. Co.,* 64 F.3d 1220, 1229 (8th Cir.1995). Defendants contend that the validity of the Assistant Secretary's decision does not turn on what he actually reviewed or knew at the time the decision was made, but rather whether or not the record before the agency supports his decision. *See, e.g.,* 5 U.S.C. § 706(2)(A); *Haynes v. United States,* 891 F.2d 235, 238 (9th Cir.1989). They also attempt to explain away the significance of the Answer filed in the D.C. litigation which Answer denied any violations of NEPA and NHPA. (Defs.' supp. br. at 13). Intervenors argue that the Court must uphold the Assistant Secretary's decision to void the lease, despite its lack of clarity, "if the agency's path may reasonably be discerned" from the record that was before the agency. *MVMA,* 463 U.S. at 43, 103 S.Ct. 2856; *see also California Dep't of Health Servs. v. Babbitt,* 46 F.Supp.2d 13 (D.D.C.1999).

[¶ 20] As stated in the Order granting a preliminary injunction, the Assistant Secretary's letter to the Tribe, dated January 27, 1999, in which he declares the lease void, offers no findings of fact or conclusions of law to support his decision. A reviewing court is thus left with no basis at all on which to review the factors underlying his decision. The Court remains unpersuaded by defendants' argument that what the Assistant Secretary and his staff may have reviewed or not reviewed is immaterial. This position is entirely inconsistent with the standard of review—whether the decision maker considered all the relevant factors before reversing decisions made by local or other agency personnel. The administrative record is voluminous. Most of the documents comprising the administrative record were not received by the Assistant Secretary's office until January 25–26, 1999, only one or two days prior to the decision to void the lease.[6] Thus, it is

6. Defendants' attempt to supplement the administrative record, Doc. 72, is further proof that the Assistant Secretary did not have the entire administrative record available to him

impossible that the Assistant Secretary or even his staff could have adequately reviewed the record in order to meet any standard of review. Moreover, defendants' reliance on EPA's concerns with the project is further evidence that the Assistant Secretary's decision was arbitrary and capricious. EPA indicated at the outset that it was only going to assume a limited role in overseeing the project (Tr. at 218–19). The EPA September and October letters were sent to BIA officials after the comment period on the draft EA had expired on July 29, 1998, and the content of the letters indicated a lack of familiarity with certain details of the project as well as with mitigation measures (Tr. 272, 330, 342–43). Nonetheless, Superintendent Burr convened two meetings with the EPA and representatives of the Tribe, Sun Prairie, and the South Dakota Department of Environment and Natural Resources (a state agency having no jurisdiction at all in Indian Country) to address the concerns (Tr. at 222)[7]. Moreover, the testimony of Ms. Campbell at the preliminary injunction hearing was unconvincing in explaining EPA's concerns with the project and in justifying the actions that the agency pursued prior to the Assistant Secretary's decision to void the lease.[8]

[¶ 21] Nor is the Court persuaded by defendants' argument regarding the relevance of their Answer in the D.C. litigation (Defs.' supp. br. at 13). As explained in the order granting a preliminary injunction, defendants' answer was filed pursuant to the requirements of Fed.R.Civ.P. 11(b). They certified that their legal position was "formed after an inquiry reasonable under the circumstances," that their "allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery," and that their denials of "factual contentions" being made by the D.C. plaintiffs "are warranted on the evidence." Taking into account all of the foregoing, including the Assistant Secretary's failure to provide any specific reasons for his decision to void the lease, his decision not to testify at the hearing before this Court or to offer any other satisfactory evidence explaining his action, as well as the fact that he or his staff could not possibly have made any adequate (or even cursory) review of the administrative record prior to his decision, the Court finds that the Assistant Secretary's decision to void the lease was arbitrary, capricious, an abuse of discretion, and was otherwise not in accordance with law.[9]

[¶ 22] An important policy consideration must also be addressed in determining the

prior to his decision to void the lease and that he could not have considered all possibly relevant factors.

7. Superintendent Burr testified that there was consensus among those at the meeting that the project was environmentally sound, the lease approval was valid, and that construction could commence. (Tr. at 224.) Plaintiffs point out that defendants did not introduce any evidence to contradict this testimony.

8. Citing Ms. Campbell's testimony, plaintiffs state that EPA initiated meetings with CEQ, BIA headquarters in Washington, D.C., and the Department of Justice without advising plaintiffs or affording them an opportunity to participate in the meetings (Tr. at 318, 325, 328). These meetings did not result in referring the matter to the Council on Environmental Quality ("CEQ") for resolution of interagency NEPA disputes, pursuant to federal regulations. *See* 40 C.F.R. §§ 1504.1–1504.3. These events raise additional questions as to the total lack of due process afforded plaintiffs.

9. Defendants argue that if the Assistant Secretary's decision to void the lease is determined to be arbitrary and capricious, the Court should remand the matter to the agency for additional investigation. *See Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). However, like the Tenth Circuit in *Woods Petroleum,* this Court concludes that remand for further investigation or explanation would be fruitless, especially in light of the Court's finding *infra* that the EA is sufficient and that the Area Directors's approval of the lease should be upheld.

validity of the Assistant Secretary's decision to void the lease-the balance between finality of decisions and compliance with NEPA. A significant factor that must be weighed under the particular facts of this case is the tribal trust relationship and the need for economic development on Native American reservations. If the Assistant Secretary's decision is upheld and permanent injunctive relief in favor of plaintiffs is denied, "the logical conclusion [would be] that bureaucratic misconduct will prejudice these plaintiffs and will also prejudice other entities who might be considering contracts with Native American Tribes for the beneficial use of tribal trust land. Indeed, the failure of this project based on administrative ineptitude and procedural unfairness would absolutely deter private entities and lending institutions from pursuing economic relationships with the various tribes. Such circumstances are in direct contravention with (sic) the unique duty of the federal government toward Native American tribes and would block the economic self-determination of the tribes." (Doc. 53 at 13). The federal government has a "distinctive obligation of trust" with regard to Indian tribes. *Seminole Nation v. U.S.*, 316 U.S. 286, 296, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942). Indian tribes and their members occupy "a unique legal status." *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974).

### IV. Equitable Doctrines Applicable to the Assistant Secretary's Decision

[¶ 23] It is well settled that the government may not be estopped on the same terms as other litigants. *United States v. Schoenborn*, 860 F.2d 1448, 1452 (8th Cir. 1988), *citing Heckler v. Community Health Servs.*, 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). Moreover, the Supreme Court has repeatedly indicated "that estoppel will rarely work against the government." *Conforti v. United States*, 74 F.3d 838, 841 (8th Cir. 1996), *citing Office of Personnel Management v. Richmond*, 496 U.S. 414, 423, 110 S.Ct. 2465, 2470–71, 110 L.Ed.2d 387 (1990). "The Supreme Court has imposed a more stringent standard for estopping the government because there is a strong public interest in upholding the rule of law, even where hardship may result to individuals in particular cases." *Chien–Shih Wang v. Attorney General of United States*, 823 F.2d 1273, 1276 (8th Cir.1987).

[¶ 24] The Eighth Circuit has recognized that "even if equitable estoppel is applicable against the government only a showing of 'affirmative misconduct' will suffice." *Schoenborn*, 860 F.2d at 1452, (quoting *McDermott v. United States*, 760 F.2d 879, 882 (8th Cir.1985)). There must be representation of a material fact, reasonable reliance and "affirmative misconduct" by an agency or government official. *See, e.g., Heckler, supra,* and *Rowden v. Warden*, 89 F.3d 536, 537, (8th Cir.1996), *citing Olsen v. United States*, 952 F.2d 236, 241 & n. 2 (8th Cir.1991). The law in South Dakota is similar. *See Even v. City of Parker*, 1999 SD 72, 597 N.W.2d 670 (SD 1999), *citing City of Rapid City v. Hoogterp*, 85 S.D. 176, 179 N.W.2d 15, 17 (1970). In the present case, the FONSI and subsequent lease approval constitute the representations of material facts. Plaintiffs reasonably relied on these representations when Sun Prairie commenced construction on the project after the 30–day notice and appeal period had ended and no appeals had been filed. As foreshadowed in the preliminary injunction, the Court finds the Assistant Secretary's unilateral decision to void the lease, with or without authority, after the period within which to appeal had expired, without providing any findings of fact or conclusions of law to justify or explain his decision, and without extending adequate due process to plaintiffs constitutes the requisite "affirmative misconduct." Further affirmative misconduct occurred in the Assistant Secretary filing a pleading in federal court one day and the next day taking the very opposite position, especially after having not reviewed any significant portion of the administrative record.

In addition to finding that the Assistant Secretary's actions were arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law, the Court finds that his actions are unlawful under the doctrine of equitable estoppel, this being the rare case for the application of such doctrine against the federal government.

[¶ 25] It does not appear that the Eighth Circuit has held that the doctrine of laches cannot be applied against the federal government. Some courts regard the question of whether laches may be applied against the government as being completely unsettled. *See United States v. Administrative Enters.,* 46 F.3d 670, 672 (7th Cir.1995), *citing JANA, Inc. v. United States,* 936 F.2d 1265, 1269 (Fed.Cir.1991). Certain Supreme Court decisions indicate an unwillingness to conclude that laches cannot apply against the government in certain egregious circumstances. *See, e.g., Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 95–96, 111 S.Ct. 453, 457–58, 112 L.Ed.2d 435 (1990); *Heckler,* 467 U.S. at 60–61, 104 S.Ct. at 2224. If applied to the facts of the instant case, the elements of the doctrine-unjustifiable delay and prejudice-would be easily satisfied. *See, e.g., Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.,* 182 F.3d 598, 602 (8th Cir.1999), *citing Elvis Presley Enters. v. Capece,* 141 F.3d 188, 205 (5th Cir.1998). The Assistant Secretary was aware of alleged NEPA violations as early as October of 1998,[10] but waited four to five months to make the decision to void the lease, a decision made in the face of pending litigation. Like the plaintiff in *Hubbard Feeds,* the Assistant Secretary has not posited any plausible excuse for the delay in making his decision. *Id.* Relying on the lease approval, Sun Prairie invested $5,000,000 on construction of phase I. Moreover, the bank financing for the project was linked to other ventures and the ramifications of the Assistant Secretary's decision threatened great and irreparable harm to Sun Prairie's established business reputation as well as that of the Tribe. Sun Prairie has been pressured, which could not come as a surprise to anyone, by its lenders who have naturally felt great anxiety about the ability of Sun Prairie to pay its loans and even to survive financially. Sun Prairie was required to pledge property in other states to secure its obligations for this project. It is high time that the BIA conduct its affairs in a timely and business-like manner to give confidence to Tribes, all Native Americans, their business partners, and lending institutions so that they can rely upon the BIA to do what they say they are going to do. The principles of equity dictate that the Assistant Secretary's decision cannot be upheld.

### V. The Sufficiency of the Environmental Assessment under NEPA

[¶ 26] Although the Assistant Secretary's letter voiding the lease fails to identify any specific shortcomings of the EA or offer any reasonable basis for requiring the preparation of an EIS, the Court will undertake the inquiry in order to resolve all challenges presented in this matter.

[¶ 27] NEPA requires federal agencies to prepare an EIS statement relating to "proposals for ... major Federal actions [11]

10. Assistant Secretary Gover was sent a courtesy copy of a letter from the EPA to Superintendent Burr dated October 15, 1998. The letter focused on the EPA's comments for the final EA. An enclosure, entitled "EPA NEPA Review Comments," accompanied the letter and detailed various claimed violations (Defs.' Position on Plaintiff's Motion for Temporary Restraining Order, Doc. 9, Exhibit 1).

11. Cases decided by other Circuits have generally held that approval of leases between tribes and private parties for economic development projects on tribal trust land constitute "major federal actions." *See, e.g., Sangre de Cristo,* 932 F.2d at 893 (involving a lease for a world class golf course and residential community on approximately 5,000 acres of tribal land). Although the Court questions the rationale underlying some of these holdings based on tribal sovereignty considerations and the fact that the only federal action is approval of the lease, the parties do not contest the issue, and thus the Court will not address it.

significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The Council on Environmental Quality ("CEQ") regulations implement NEPA and provide that an agency should prepare an environmental assessment for an action if the agency decides it is not categorically excluded from the impact statement requirement. The EA functions as a preliminary environmental inquiry. *See* 40 C.F.R. § 1501.4(b). The assessment "[s]hall include brief discussions of the need for the proposal, of alternatives ... of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b). If the agency determines on the basis of the environmental assessment not to prepare an impact statement, it must prepare a finding of no significant impact, which

> present[s] the reasons why an action ... will not have a significant effect on the human environment and for which an environmental impact statement will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it.... If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference.

40 C.F.R. § 1508.13.

[¶ 28] In *Lockhart v. Kenops,* the Eighth Circuit held that the arbitrary and capricious standard should be applied to informal determinations of an agency, including an agency's decision not to prepare an EIS. 927 F.2d 1028, 1032 (8th Cir.1991), *citing Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). In a challenge to an agency's decision not to prepare an EIS, the initial burden is on the challengers to raise "a substantial environmental issue" that has been omitted from consideration in the EA or otherwise in the administrative record. *See Winnebago Tribe of Nebraska v. Ray,* 621 F.2d 269, 271 (8th Cir.1980). Similarly, the decision to issue a FONSI is committed to the agency's discretion, the judgment made is presumptively correct, and the burden is on the challengers to prove that the decision is erroneous. *See Ringsred v. Duluth,* 828 F.2d 1305, 1307 (8th Cir.1987) and *Kuff v. U.S. Forest Serv.,* 22 F.Supp.2d 987, 993 (W.D.Ark.1998). If it is shown that the agency "took a 'hard look' at the project, identified relevant areas of concern, and made a convincing case for the FONSI," the environmental review is sufficient. *See Sierra Club v. United States Forest Serv.,* 46 F.3d 835, 838–39 (8th Cir.1995). The adequacy of the EA as a basis for issuing the FONSI and approving the lease must be reviewed within the confines of the administrative record [12] and the Court must extend substantial deference to the decisions of the local BIA officials. *See Troy Corp. v. Browner,* 120 F.3d 277, 283 (D.C.Cir.1997). A decision to forego preparation of an EIS will not be found arbitrary and capricious if it appears from the record that the decision was based on a "reasoned evaluation 'of the relevant factors.'" *Marsh,* 490 U.S. at 378, 109 S.Ct. at 1861. Moreover, a party challenging an agency decision under NEPA must provide evidence to substantiate any claim of environmental harm and "cannot simply doubt the FONSI ... without pointing to more than speculative impacts." *Sierra Club,* 46 F.3d at 839. Having heard the evidence, this Court is convinced that nothing more than "speculative impacts" were put forward by the intervenors. Witnesses presented by in-

12. When determining the sufficiency of the EA, "'[t]he existing administrative record may be "supplemented, if necessary, by affidavits, depositions, or other proof of an explanatory nature."'" *See, e.g., Sierra Club v. U.S. Army Corps of Engineers,* 771 F.2d 409, 413 (8th Cir.1985) (quoting *Arkla Exploration Co. v. Texas Oil & Gas Corp.,* 734 F.2d 347, 357 (8th Cir.1984), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 905, 83 L.Ed.2d 920 (1985)). The Court is not persuaded by defendants' and intervenors' arguments that new and additional information was considered to mitigate the environmental impacts of the project which information was considered only after the FONSI was issued.

tervenors were certainly people of good faith with honestly held convictions but nothing was presented to substantiate any claim of environmental harm. The defendants called no witnesses at all. The witness from the EPA admitted that she was "out of the loop." She admitted that as the project is now designed and will apparently be operated, there would be no environmental harm. By contrast, the testimony of the witnesses for plaintiffs was compelling. This is especially the case of the testimony and the evidence presented by BIA Superintendent Burr, a very credible witness.

[¶ 29] Whether an EIS must be prepared to satisfy compliance with NEPA requirements is governed by a set of regulations developed by CEQ. *See* 40 C.F.R. §§ 1500–1508 (1998). BIA has developed guidelines for implementing CEQ regulations, as have other agencies. *See* 30 BIAM Supplement 1 NEPA Handbook ("BIA NEPA Handbook"). CEQ regulations describe an EA as a "concise public document" which includes a "brief discussion" of (1) the need for proposed action, (2) alternatives to the proposed action, and (3) the environmental impacts of the proposed action and alternatives. *See* 40 C.F.R. § 1508.9. An EA is intended to provide "sufficient evidence" to determine if a full EIS is warranted but, because of the nature of the document, it is not intended to provide a comprehensive evaluation of NEPA issues. *Id.*; *see also Newton County Wildlife Ass'n v. Rogers,* 141 F.3d 803, 809 (8th Cir.1998) (quoting *Cronin v. United States Dep't of Agric.,* 919 F.2d 439, 443 (7th Cir.1990), to explain that "[a]n EA is a 'rough-cut, low-budget environmental impact statement ...' "). Under CEQ regulations and the BIA implementation guidelines, the purpose of the FONSI is to briefly explain why the agency action will not have a significant effect on the human environment, but it need not reiterate all of the evidence accumulated in the administrative record. *Id.* at § 1508.13 and BIA NTEPA Handbook, § 4.3H. Moreover, an EA may incorporate by reference, information and analysis already available in both NEPA-compliant materials, *see, e.g.,* 40 C.F.R. §§ 1500.4–.5, 1506.4 and BIA NEPA Handbook §§ 3.2(B), 4.5(B), and general background information, documents, and studies not prepared for NEPA purposes. *See Jackson County v. Jones,* 571 F.2d 1004, 1008 (8th Cir.1978).

[¶ 30] In support of their position that the EA is sufficient and provides an appropriate basis for issuing the FONSI, plaintiffs emphasize that all project sites have been designed as "no discharge" facilities and that the design for the entire project incorporates state-of-the-art technology that surpasses current regulatory (both state and federal) and industry standards. Plaintiffs have refuted the accusation by defendants and intervenors that significant design changes were made to the project after the lease was approved, plaintiffs showing that any such changes were site-specific design details that were incorporated as the project progressed. Defendants argue that the EA does not contain sufficient information to warrant the issuance of the FONSI. They also contend that the EA does not identify all relevant areas of environmental concern nor does it support a finding that mitigation measures will reduce adverse impacts. Intervenors similarly point to alleged deficiencies of the EA, including a failure to consider both cumulative impacts and alternatives. They also contend that the BIA failed to provide for public participation. Intervenors argue that an EIS should have been prepared and each of the CEQ significance criteria should have been addressed.

[¶ 31] The first question is whether the EA adequately identifies and describes the purpose of the project, alternatives to the proposed action, and the affected environment. *See* 40 C.F.R. § 1508.9; BIA NEPA Handbook 4.3B–D. (AR 3:0437.) Upon review of the 76-page EA,[13] it is

13. BIA NEPA Manual 4.3 states: "An EA should normally be no more that [sic] 15 or 20 pages in length, unless it has been decided to prepare a longer, more detailed EA to aid

readily apparent that the document complies with these requirements. The EA concisely identifies the purpose of and need for the project: "The intent of the proposed facility is to bring economic development and opportunity to the Rosebud Sioux Tribe." (AR 1:00010.) Nothing more is required under BIA NEPA Handbook 4.3C (AR 3:0437). The EA also provides a description of reasonable alternatives, including "no action." *See* AR 1:00016–00021. In the initial paragraph of this section, the EA clearly provides that the size of the project facilities and the waste management systems would remain the same for each alternative considered. The size and capacity of the project were specified by Sun Prairie based on economic feasibility (AR 1:00016). This situation is of particular significance in the context of a private corporation acting as a third party with a tribe and the BIA in pursuing activities on tribal trust land. Unlike the far mora common situation in which the federal agency itself is pursuing the activity, the only federal involvement is approval of the land lease. A private entity interested in bringing economic development opportunities to the reservations must primarily consider its own economic interests. Therefore, the alternatives evaluated in an EA are likely to be fewer in number and defined by economic feasibility factors.[14] The EA in the instant case considered primarily a "no-action" alternative and a "preferred" alternative. Alternatives regarding the size of the evaporation ponds and alternative locations were also considered (AR 1:12, 20) (Tr. at 60–61). Although the project requires approximately 1,135 acres, over 4,000 acres were studied in the EA for the entire project (AR1:12.). This analysis of alternatives is sufficient. Defendants argue that the EA was flawed in not providing a reasonable range of alternatives in conjunction with an analysis of cumulative impacts and mitigation measures (Doc. 79, page 23—Defs.' supp. brief). Intervenors argue that the EA did not consider any alternative ways to provide economic opportunities for the Tribe or describe alternative designs for the proposed project that would reduce the environmental impacts, yet still provide job opportunities for the Tribe. (Intervenors'—Defs.' supp. brief at 24). The Court agrees with plaintiffs that the range of alternatives explored in the EA satisfies NEPA's requirements. A private corporation, with an established reputation in the pork production industry, knows which alternative is economically feasible-the preferred alternative. Given the significant need for economic development in the region, it would not be an effective or logical public policy to require private corporations to consider various alternatives which may not be in their economic self-interest, simply for the sake of considering alternatives in the EA.

[¶ 32] The EA methodically identifies and details the affected environment, using the components set forth in BIA NEPA Handbook 4.3E (AR 3:0437) [15]. For example, with regard to soils, the EA incorporates by reference maps contained in the *Soil Survey of Mellette County, SD* [White, 1975], and describes the three general categories of soil types within the project area and the soil characteristics (AR 1:00025–00027). The EA effectively addresses concerns regarding the Water supply and possible water contamination. Among other documents, the EA incorporates by reference the Final EA for the

in planning and decisionmaking (sic)." (AR 3:0436.)

14. *See, e.g., Kuff,* 22 F.Supp.2d at 995, *citing Sierra Club v. Robertson,* 810 F.Supp. 1021, 1029 (W.D.Ark.1992), to hold that "NEPA does not require agencies to consider alternatives that do not achieve the purpose of the proposed action."

15. BIA NEPA Handbook 4.3E provides: "The 'Affected Environment' (section § 1502.15) should succinctly describe the area in which the proposed action would occur. Page-sized maps of the general area and the project site help avoid superfluous description. Incorporation of sections of earlier environmental documents by reference may also be appropriate along with a summary of the key facts included in these references."

Mni Wiconi Rural Water Project, which water project has anticipated water allocation to pork production facilities as one possible economic development project in the region (AR 1:51, 207, 704) and concludes that the project's impact on the Water supply from the Missouri River will be less than negligible (AR1:767). The EA addresses the impact of the project on the Dakota and Ogallala aquifers (AR 1:00267–00276; Tr. at 202–207). As to water contamination concerns, the EA relies on the design of the project facilities and mitigation measures to adequately reduce the significance of the impacts (AR 1:00002, 00200; Tr. at 198–200). The EA contains detailed sections on fish and wildlife as well as social and economic conditions (AR 1:00034–00045), among other areas of environmental concern. Intervenors contend that the EA failed to analyze obvious impacts such as odor, disease transmission, and economic effects on the local economy, particularly the agricultural economy. However, as plaintiffs point out, an agency's failure to consider an arguably relevant factor does not, by itself, establish a NEPA violation. The administrative record may reveal that the factor was not sufficiently significant to merit discussion. *See Sierra Club,* 46 F.3d at 839 (upholding the sufficiency of the EA despite the lack of discussion on the impact of the activities on private land and finding that "[t]he EA did not make elaborate findings but nothing in the record suggests a need for more extensive analysis"). Thus, applying this holding to the administrative record in the present case, the Court concludes that the EA adequately identified and detailed the impacts of the project on the environment.

[¶ 33] The second question is whether preparation of an EIS was required based on the information contained in the EA. To reiterate, it is defendants' and intervenors' burden to prove that the decision not to prepare an EIS constitutes a violation of NEPA. In reviewing an agency's decision not to prepare an EIS, the Eighth Circuit has adopted the "hard look" doctrine. *Audubon Society of Central Ark. v. Dailey,* 977 F.2d 428, 434 (8th Cir.1992). A court should consider four factors in determining whether an agency's decision to forego an EIS is arbitrary and capricious:

(1) whether the agency took a hard look at the problem, as opposed to bald conclusions, unaided by preliminary investigation;

(2) whether the agency identified the relevant areas of environmental concern;

(3) whether, as to problems studied and identified, the agency made a convincing case that the impact is insignificant; and

(4) if there was impact of true "significance," whether the agency convincingly established that changes in the project sufficiently minimized it.

*Id., citing Cabinet Mountains Wilderness v. Peterson,* 695 F.2d 678, 681–82 (D.C.Cir. 1982). The discussion under the first question above, addressing the adequacy of the EA, leads to an affirmative answer to the first two prongs of the "hard look" doctrine.

[¶ 34] As to the third prong, in making a significance determination, an agency must consider both the "context" and "intensity" of the impact. 40 C.F.R. § 1508.27. "Context" means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action ... 40 C.F.R. § 1508.27(a). Intensity "refers to the severity of the impact" and the regulations direct an agency to consider a number of relevant factors in this regard:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park

lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts ... Significance cannot be avoided by ... breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historic resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat ...

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

40 C.F.R. § 1508.27(b); BIA NEPA Handbook 5.2, 5.3B (AR 3:0445–0446).

[¶ 35] Intervenors attack the decision not to prepare an EIS, relying on each of the ten factors and primarily on concerns expressed by EPA and DENR (which state agency has no jurisdiction of any kind in Indian County). As previously discussed in the context of defendants' arguments, such reliance is misplaced. The intervenors' material evidence and arguments are speculative and conclusory, insufficiently supported by the record, or arguments attempted to be supported by evidence outside the scope of the administrative record.[16] Thus, the evidence presented by intervenors and defendants and their arguments clearly fail to meet the required burden of proof. The inquiry will focus on CEQ significance factors (1), (4), (8), and (9).

[¶ 36] Intervenors contend that an EIS should have been prepared even if the effects of the project are "beneficial" as long as they are "significant." Citing the EPA and the DENR, intervenors argue that the project is likely to have adverse effects on the environment. As discussed previously, the EPA failed to comment within the comment period and the EPA letters that were finally sent to BIA officials lacked familiarity with many details of the project and mitigation measures (Tr. 272, 330, 342, 343). Similarly, the intervenors cite DENR comments that were filed after the comment period expired and that are not part of the administrative record. Both agencies' actions are questionable since neither agency became involved (if they wished to become involved) when they should have. Intervenors also argue that BIA Superintendent Burr admitted under oath that he believed there would be sufficient beneficial impacts from the project (Intervenors'—Defs.' supp. br. at 18). However, the conclusion that a project will have purely beneficial impacts does not require preparation of an EIS. *See Friends of Fiery Gizzard v. Farmers Home Admin.*, 61 F.3d 501, 505 (6th Cir. 1995) (finding, "[t]he mere fact that the Fiery Gizzard will have a positive impact on the health and welfare of the people it serves does not compel the conclusion that the project may not go forward without an EIS that would not otherwise be required."). Thus, intervenors have failed to

16. These deficiencies apply to intervenors' challenges under CEQ significance factors (2), (3), (5), (6), (7), and (10).

show that, under intensity factor one, an EIS should have been prepared.

[¶ 37] Intervenors argue that the record overwhelmingly demonstrates that the known effects of the project on the quality of the human environment are highly controversial. (Intervenors'—Defs.' supp. br. at 19). As evidence, intervenors draw attention to the "highly critical" comments received by the BIA during the course of the EA. Particularly, intervenors stress the comments of the EPA and the DENR. However, intervenors' argument fails because "controversial" refers to the existence of a "substantial dispute ... as to the size, nature, or effect of the major federal action rather than to the existence of opposition to a use," *Lockhart,* 927 F.2d at 1035 (quoting *Rucker v. Willis,* 484 F.2d 158, 162 (4th Cir.1973)). Opposition alone is not sufficient to require that an EIS be prepared. *Rucker,* 484 F.2d at 162. Thus, an EIS should not be required based on intensity factor four.

[¶ 38] As to the eighth factor, intervenors argue that the property is eligible for listing in the National Register and any action will affect and has already adversely affected the cultural history of the property. Specifically, intervenors argue that the BIA knew of the "Historic Indian Trail" and that no survey was conducted of the project area. (Intervenors'—Defs.' supp. br. at 28). Plaintiffs did perform a Class I survey of the entire project area and reported in the EA that no resources of significance were discovered (AR 1:00070–00071). The EA also mandated a mitigation measure, namely that a Class III on-the-ground survey be performed at each site prior to construction (AR 1:00071). Again, the methods and measures used are in accord with both NEPA and NHPA protocols. Moreover, intervenors have failed to produce any evidence about how the project has adversely affected the cultural history of the property or will affect the property in the future. Furthermore, even if the trail was included in the National Register, this alone does not require the preparation of an EIS. *See Friends of the Astor v. City of Reading,* 1998 WL 684374 *7 (E.D.Pa.) (finding that "the fact the Astor [was] listed in the National Register [did] not alone require the preparation of an EIS when its demolition [was] proposed."). Accordingly, intervenors have not met their burden in proving that an EIS was required based on factor eight.

[¶ 39] Under the ninth factor, intervenors state that the action may "adversely affect" endangered or threatened species. In particular, intervenors name the bald eagle, the black footed ferret and the sturgeon chub. Intervenors cite the September 18, 1998, letter from the U.S. Fish and Wildlife Service. However, this letter clearly states, "[w]e concur that construction at these sites is not likely to adversely affect the bald eagle (*Haliaeetus leucocephalus*) ... [or the] black-footed ferret (*Mustel nigripes*)." The letter also confirms that the sturgeon chub (*Hybopsisgelida*) is a federal candidate species, namely a species precluded from both the threatened and endangered species lists. *See also* July 29, 1998, U.S. Fish and Wildlife Service letter (AR2:00107–00108); *Surfrider Found. v. Dalton,* 989 F.Supp. 1309, 1321 (S.D.Cal.1998) (stating that defendant could reasonably rely on the findings of the U.S. Fish and Wildlife Service). Furthermore, under the mitigation measures included in the EA, if any listed species or critical habitat is discovered, the project must immediately cease and the U.S. Fish and Wildlife Service must be contacted (AR1:00054). Therefore, intervenors have failed to prove-that an EIS was required based on factor nine.

[¶ 40] The fourth prong of the "hard look" doctrine relates to mitigation measures. The BIA NEPA Handbook provides that mitigation measures may be properly integrated into a project to eliminate or substantially reduce potential environmental impacts if such measures are required by statute or regulation and are enforceable, or if the measures are integrated as part of the proposal (AR 1:64–67; 3:440, 529). The Court concludes that

the mitigation measures identified in the EA, particularly those inherent in the design of the project facilities, are sufficient to support the FONSI. The testimony of Superintendent Burr during the preliminary injunction hearing as to the details of these mitigation measures and federal and tribal enforcement rules was very convincing, especially when compared to the testimony of EPA official Campbell who admitted that she was not familiar with many aspects of the mitigation measures and the various enforcement provisions specified in the EA (Tr. at 326–30). Thus, after considering the previously discussed four factors this Court determines that the decision to forego an EIS was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

[¶ 41] Intervenors continue to allege that the local BIA officials failed to comply with the public notice and involvement requirements specified in 40 C.F.R. § 1506.6. However, upon closer review of the administrative record, it is clear that the local officials complied with the BIA Manual guidelines. *See* BIA NEPA Handbook 5.4B(2), AR 2:00201 and AR 3:0447. Even if the Court were to find that the availability of the FONSI and the final EA may not have been adequately communicated, notice deficiencies do not require setting aside an agency decision unless the complaining party can demonstrate that it was prejudiced by such deficiencies. *See, e.g., Environmental Coalition of Ojai v. Brown,* 72 F.3d 1411, 1416 n. 5 (9th Cir. 1995), *citing Northwest Coalition for Alternatives to Pesticides v. Lyng,* 844 F.2d 588, 595 (9th Cir.1988). Intervenors and defendants have not adequately demonstrated to the Court that the local BIA officials failed to comply with the CEQ regulations and BIA implementing guidelines and that they suffered prejudice as a result of such alleged non-compliance.

## CONCLUSION

[¶ 42] Defendants and intervenors have failed to meet their burden in raising a "substantial environmental issue" that was omitted in the EA or otherwise in the administrative record and in proving that the decision to issue the FONSI was erroneous. *See Winnebago Tribe of Nebraska v. Ray,* 621 F.2d 269, 271 (8th Cir.1980) and *Ringsred v. Dole,* 828 F.2d 1300, 1302 (8th Cir.1987). Further, the plaintiffs have shown that the local BIA and Area Director of the BIA took a "hard look" at the project. *See Sierra Club v. United States Forest Serv.,* 46 F.3d 835, 838–39 (8th Cir.1995). Therefore, this Court upholds the sufficiency of the EA as a basis for the FONSI. The decision not to prepare an EIS was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

[¶ 43] It must be noted that a finding that the EA was sufficient under NEPA certainly does not suggest that the project will not be and should not be subject to close scrutiny and perhaps additional studies by defendants, intervening organizations, and others to ensure full compliance with environmental regulations. As such, the Court is convinced that plaintiffs and the BIA will continually attempt to incorporate new and better means, technological and otherwise, that help protect and preserve the environment. Plaintiffs will be expected to ensure that the project is operated and maintained exactly as was represented to the Court by plaintiffs.

[¶ 44] Based on the foregoing,

[¶ 45] IT IS HEREBY ORDERED THAT:

(1) Plaintiffs' application for a permanent injunction is granted as to the project. The defendants, Bruce Babbitt and Kevin Gover, and their employees, agents, and representatives, and the intervenors, Concerned Rosebud Area Citizens, South Dakota Peace and Justice Center, Prairie Hills Audubon Society and Humane Farming Association, and their employees, agents, and representatives are expressly restrained, enjoined, and prohibited from taking any actions, other than seeking relief by appeal or other appropriate judicial relief, which actions would have the purpose or consequence of interfering or attempting to interfere with the construction

or operation of the project that is the subject of this action. The BIA and its agents, and any other federal agency or official with appropriate jurisdiction, as well as the Tribe, are not enjoined or restrained from performing their duties associated with ensuring full compliance with federal and tribal environmental laws and regulations and compliance with other statutes and regulations related to the lawful operation of the project.

(2) All objections of defendants and intervenors are overruled.

[¶ 46] Dated this 1st day of February, 2000.